*NOT FOR PUBLICATION*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| EZRA ROMANOV, <br><br> Plaintiff, <br><br> v. <br><br> MICROSOFT CORPORATION, JOHN DOE 1-10; and RICHARD ROE 1-10, <br><br> Defendant | Civil Action No. 21-03564 (FLW) <br><br> **OPINION** |

**WOLFSON, Chief Judge:**

Ezra Romanov ("Plaintiff") filed this Complaint against Microsoft Corporation ("Defendant"), asserting that Defendant is liable for online and offline abuse suffered by Plaintiff while he was an active user of Defendant's Xbox Live online gaming service, by breaching the relevant terms of their service contract when Defendant failed to protect Plaintiff. Defendant removed the action to this Court pursuant to 28 U.S.C. § 1441(b), on the basis of diversity jurisdiction. Before the Court is Defendant's motion to compel Plaintiff to arbitrate his claims in accordance with the terms set forth in the Xbox Live Terms of Use ("TOU") and the Microsoft Service Agreement ("MSA"). For the reasons set forth herein, the motion to compel arbitration is **GRANTED,** and this case is **STAYED**.[1]

---

[1] In its motion, Defendant does not seek dismissal of this action but, rather, only requests that the matter be stayed pending arbitration.

I.      BACKGROUND

Plaintiff has been an active user of Defendant's Xbox Live online gaming service since 2013, and is a community leader in the "Halo" gaming community. (Compl. ¶ 3.) Plaintiff alleges that he has been harmed by "coordinated and repeated acts of cyber-stalking and severe mental and emotional harassment and abuse" from other users of Defendant's service. (*Id*. at ¶¶ 5-9.) Specifically, Plaintiff alleges that this cyber harassment and stalking have "transcended the 'online forum'" on several occasions with Plaintiff receiving "hate mail" and other disturbing packages and letters to his primary residence, "causing him to become so concerned for his safety that he has been forced to change his address." (*Id.* ¶ 9.) Plaintiff claims that he has notified Defendant of this harassment and, despite its customer support staff repeatedly advising that it would investigate Plaintiff's grievances, no action has been taken. (*Id.* ¶¶ 13-14.)

According to Defendant, users of its Xbox Live service are required to acknowledge and accept a terms of service agreement (the "Agreement").[2] (Holbrook Decl. ¶ 3.) Since December 2011, the Agreement has included an arbitration clause that selects arbitration to resolve a broad spectrum of disputes. (*Id*. ¶ 4.) While the exact procedures for acknowledging the terms of the Agreement have changed multiple times since 2011,[3] users have always been required to accept the terms upon account creation and whenever the terms are updated. (*Id*. ¶ 4.) The full terms of

---

[2]     The terms of service contract that governs Xbox Live use was initially the Xbox Live Terms of Use ("TOU"), which became the Microsoft Services Agreement (the "MSA") on August 1, 2015. The Court refers to both the TOU and the MSA contracts, together, as "the Agreement."

[3]     Before August 2015, users creating a new account were required to accept the TOU by clicking an "Accept" button displayed on their screen. (Holbrook Decl. ¶ 3.) In August 2015, the MSA replaced the TOU, and early versions of this acceptance page required users to click a button displaying "I accept". (*Id*.) Since 2019, the MSA acceptance page has required users to click "Next" immediately adjacent to text explaining that doing so "means you agree to the Microsoft Services Agreement." (*Id*. ¶ 7.)

the Agreement have always been displayed or linked, and the user is given the opportunity to review these terms before deciding whether to accept. (*Id*.)

Every version of the Agreement at issue, including the current version, contains an arbitration clause. The most recent version of the Agreement, the 2019 MSA, begins, in bold, capitalized text:

> IF YOU LIVE IN (OR YOUR PRINCIPAL PLACE OF BUSINESS IS IN) THE UNITED STATES, PLEASE READ THE BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER IN SECTION 15. IT AFFECTS HOW DISPUTES ARE RESOLVED.

(Holbrook Decl., Ex. H, at 2.) Section 15, as indicated, sets forth the following binding arbitration clause:

> **Binding Arbitration and Class Action Waiver If You Live In (or, If a Business, Your Principal Place of Business Is In) the United States.** We hope we never have a dispute, but if we do, you and we agree to try for 60 days to resolve it informally. If we can't, you and we agree to binding individual arbitration before the American Arbitration Association ("AAA") under the Federal Arbitration Act ("FAA"), and not to sue in court in front of a judge or jury. Instead, a neutral arbitrator will decide and the arbitrator's decision will be final except for a limited right of review under the FAA.

(*Id*. § 15.) A dispute is defined by the arbitration clause "as broad as it can be" and specifically "includes any claim or controversy . . . concerning the Services [defined to include Xbox Live] . . . under any legal theory including contract [and] tort" except intellectual property disputes. (*Id*.) The arbitration clause additionally instructs users on how to initiate an arbitration proceeding and it describes the arbitration process. (*Id*.) It further specifies that arbitration will be conducted under the AAA's Consumer Arbitration Rules for individual disputes involving personal use of a service. (*Id*. § 15(d).) This provision specifically indicates that, "[u]nder AAA Rules, the arbitrator rules on his or her own jurisdiction, including the arbitrability of any claim." (*Id*.)

Plaintiff acknowledged different versions of these terms numerous times on multiple accounts. Plaintiff registered an account on June 10, 2014, and clicked a notice acknowledging the TOU. (Holbrook Decl. ¶ 9.) In August 2015, Plaintiff acknowledged the MSA after it replaced the TOU. (*Id.* ¶¶ 3, 5, 9-10.) Plaintiff also clicked a notice on August 15, 2019, acknowledging an upcoming August 30, 2019 MSA update. (*Id.* ¶ 10.) Plaintiff again acknowledged the MSA when he registered a new account on June 9, 2020. (*Id.* ¶¶ 6-7, 10-11.) Plaintiff has continued to use Defendant's gaming service as recently as January 10, 2021.

On January 9, 2020, Plaintiff purportedly completed a "Notice of Dispute" form, signed before a Notary Public, and sent it to Defendant the following day to initiate the Agreement's dispute resolution process regarding his claims of cyber stalking and harassment. Defendant allegedly did not respond.[4] On October 21, 2020, Plaintiff filed the instant Complaint in the New Jersey Superior Court, Ocean County, asserting three claims against Defendant for breach of contract related to the terms of the TOU and the MSA,[5] for intentional and negligent infliction of emotional distress, and for general negligence. (Compl. ¶¶ 19-38.) Plaintiff served Microsoft with the Complaint on January 28, 2021, and Microsoft timely removed the action on February 26, 2021. This motion to compel arbitration followed.

---

[4] The arbitration clause directs customers to first send this "Notice of Dispute" to Defendant. Following this notice, if the parties do not reach a resolution within 60 days, as is the case here, either party may submit the dispute to arbitration. (Holbrook Decl., Ex. H § 15(b).)

[5] Plaintiff does not specify which version of the Agreement he is suing under. In any event, the contested arbitration language in each version of the TOU and MSA is similar, and the legal analysis discussed below is applicable across all versions of the Agreement, each of which required Plaintiff to agree.

## II.     STANDARD OF REVIEW

The Federal Arbitration Agreement ("FAA") "'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate.'" *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 179 (3d Cir. 1999) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)). Congress designed the FAA "'to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.'" *Beery v. Quest Diagnostics, Inc.*, 953 F. Supp. 2d 531, 536-37 (D.N.J. 2013) (quoting *Gilmer v. Interstate Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). As such, the FAA provides that contracts containing arbitration clauses shall be binding, allows for the stay of federal court proceedings in any matter subject to arbitration, and permits both federal and state courts to compel arbitration if one party has failed to comply with an agreement to arbitrate. *See* 9 U.S.C. §§ 2-4. Together, "those provisions [of the FAA] 'manifest a liberal policy favoring [the enforcement] of arbitration agreements.'" *Beery*, 953 F. Supp. 2d at 537 (quoting *Gilmer*, 500 U.S. at 24). To that end, "'as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Id.* (quoting *Mercury Constr. Corp.*, 460 U.S. at 24-25).

Although federal law presumptively favors the enforcement of arbitration agreements, a district court must affirmatively answer the following questions when presented with a motion to compel arbitration pursuant to Section 4 of the FAA: (1) whether the parties entered into a valid arbitration agreement; and (2) whether the dispute at issue falls within the scope of the arbitration agreement. *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009). Federal courts apply applicable state contract law in evaluating whether a valid arbitration

agreement exists. *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 289 (3d Cir. 2017). When "applying the relevant state contract law, a court may also hold that an agreement to arbitrate is 'unenforceable based on a generally applicable contractual defense, such as unconscionability.'" *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 276 (3d Cir. 2004) (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

### III. ANALYSIS

Defendant moves to stay this action and to compel Plaintiff to arbitrate his claims, pursuant to the arbitration clause. Plaintiff opposes Defendant's motion to compel arbitration on two bases. First, Plaintiff contends the Agreement did not provide unambiguous notice that he was waiving his right to bring a civil action. (Opp., at 8.) Second, Plaintiff argues that, even if a valid agreement existed, the Agreement should not be enforced because it is unconscionable. (*Id*. at 9-10.)

#### a. The Parties Agreed to Arbitrate Disputes

Defendant argues that Plaintiff, in acknowledging the terms of the TOU and the MSA, agreed to arbitrate all disputes, and that the requisite intent to be bound to the terms of the Agreement was evident in Plaintiff's numerous indications of assent. (Moving Br., at 15.) Under the relevant procedures, Defendant reasons that Plaintiff could not have used the gaming services without indicating his assent to the terms by first clicking a button near the linked terms.[6] (*Id*.) Further, within the Agreement, Defendant explains that Plaintiff agreed to be bound to "individual arbitration before the American Arbitration Association ("AAA") under the FAA, and not to sue

---

[6] Plaintiff does not dispute that he assented to the terms of the Agreement. (Compl. ¶ 22.) ("Plaintiff assented to the Defendant's terms of service as a paying subscriber of the service/platform.")

6

in court in front of a judge or jury." (*Id.* at 6; Holbrook Cert., Ex. H, "Microsoft Services Agreement".)

On the other hand, Plaintiff insists that the arbitration clause cannot be enforced, because the Agreement was insufficiently clear to put him on notice that he was waiving his right to file a civil suit by agreeing to its terms.[7] (Opp., at 4.) Plaintiff, relying primarily on *Atalese v. U.S. Legal Services Group, L.P.*, 219 N.J. 430 (2014), argues that the Agreement's arbitration clause was insufficiently clear to put him on notice that he was waiving his rights; that is, Plaintiff posits, the section of the arbitration clause that properly informed him of this waiver was "buried towards the end of this verbose, jargon filled legal document." (Opp., at 6, 9.)

Under New Jersey law, an agreement to arbitrate, like any other contract, "must be the product of mutual assent, as determined under customary principles of contract law." *James v. Glob. TelLink Corp.*, 852 F.3d 262, 265 (3d Cir. 2017) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). "[I]f parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Crawford v. Compass Grp.*

---

[7] In the facts section of Plaintiff's opposition brief, citing his own Certification, Plaintiff asserts that he did not assent to the terms of the Agreement because he does not recall "agreeing to the terms of service" and he "had no substantive understanding of what he was signing when he clicked the box on his screen." (Opp. Br., at 4-5. (citing Romanov Cert., ¶¶ 5-7).) However, these assertions do not appear in any legal argument in the brief, and, as such, I need not consider it as a basis for Plaintiff's arguments. *See* L. Civ. R. 7.2(a); *Jones v. Intarome Fragrance Corp.*, No. 04-5625, 2007 WL 1296656, at *4 (D.N.J. Apr. 27, 2007) (disregarding arguments in a Certification rather than in the brief "with appropriate legal authority"). In any event, this argument is unpersuasive. Courts in this District have consistently found clickwrap agreements, like the one at issue here, to be enforceable "when the consumer is provided 'reasonable notice' that arbitration terms apply to the agreement." *Beture v. Samsung Elecs. Am., Inc.*, No. 17-5757, 2018 WL 4259845, at *5 (D.N.J. July 18, 2018) (citations omitted). "Once there is reasonable notice, a party is bound by those terms, *even if he failed to read them.*" *Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 116 (3d Cir. 2017) (emphasis added). Here, Defendant provided Plaintiff with reasonable notice of the additional terms of the Agreement. Moreover, the Court's review of the online terms reveals that they are legible, and their language is clear. (Holbrook Decl., Exs. C, D, I-L.)

*USA*, No. 14-2545, 2015 WL 1006389, at *3 (D.N.J. Mar. 6, 2015). To manifest assent, "an offeree must provide 'unqualified acceptance,' which can be express or implied by conduct." *James*, 852 F.3d at 265; *see also Fernandez v. Primelending*, No. 20-31, 2020 WL 6042119, at *4 (D.N.J. Oct. 9, 2020). To meet this mutual assent requirement, arbitration clauses must clearly and unambiguously indicate "that a consumer is choosing to arbitrate disputes rather than have them resolved in a court of law." *Atalese*, 219 N.J. at 447.

Under the standard set forth in *Atalese*, the Agreement here unambiguously notified Plaintiff that by assenting, he was waiving his right to bring a civil suit. The first line of the Agreement indicates the presence of the arbitration clause, states that it affects how disputes are resolved, and directs the reader to the section where it appears. In that section, in bold type, the arbitration clause contained in the TOU states, "YOU UNDERSTAND AND ACKNOWLEDGE THAT BY AGREEING TO BINDING ARBITRATION, YOU ARE GIVING UP THE RIGHT TO LITIGATE . . . ALL DISPUTES IN COURT BEFORE A JUDGE OR JURY." (Holbrook Decl., Ex. A § 18.1.4.) The MSA, which replaced the TOU in 2015, contains similar, precise, language: "you and we agree to binding individual arbitration . . . and not to sue in court in front of a judge or jury." (Holbrook Decl., Ex. B § 15; *id.*, Ex. G § 15.)

Plaintiff admits that this language, "buried" in the body of the Agreement, "clearly inform[s] its subscribers that they are waiving the right to sue." (Opp., at 9.) Indeed, this language meets the standard set forth in *Atalese*. However, the fact that the required language does not appear in the introduction of the Agreement does not otherwise render the arbitration requirement deceptive or unclear. Many New Jersey courts have upheld arbitration clauses where the waiver language appears later in the body of the contract. *See, e.g.*, *Martindale v. Sandvik, Inc.*, 173 N.J. 76, 81-83 (2002) (arbitration language appears on page four of employment application); *Signore*

8

*v. GWC Warranty Corp.*, No. 0949-17, 2018 WL 2247353, at *3 (N.J. Super. Ct. App. Div. May 17, 2018) (arbitration language appeared on last page of the car service agreement); *Curtis v. Cellco Partnership*, 413 N.J. Super. 26, 30-31 (App. Div. 2010) (arbitration language appears in the body of Verizon Wireless Customer Agreement's arbitration clause); *Griffin v. Burlington Volkswagen, Inc.*, 411 N.J. Super. 515, 516-18 (App. Div. 2010) (arbitration language appears in the body of retail car order form's arbitration clause).

The language of the Agreement, and the relevant arbitration clause, are "simple, clear, understandable and easily readable," as required by N.J. Stat. Ann. § 56:12-2.[8] In fact, the plainly written notice at the outset of the Agreement, which informs readers of greater details within, adds a layer of clarity to the Agreement. Therefore, I find the arbitration clause in the Agreement to be sufficiently clear and unambiguous such that Plaintiff knowingly waived his right to bring a civil suit.

### b. Issues of Arbitrability are Delegated to the Arbitrator

Plaintiff argues that, because of the presence of the arbitration clause, the Agreement is an unconscionable contract of adhesion that violates New Jersey public policy. (Opp., at 10.) Defendant, in response, contends that this is a question for the arbitrator, citing a provision in the arbitration clause that delegates the gateway issue of arbitrability to the arbitrator. (Reply, at 18.) All forms of the Agreement expressly indicate that the AAA Consumer Arbitration rules govern arbitration. (Holbrook Decl., Exs. A & B.) Accordingly, under these rules, "[t]he arbitrator shall

---

[8] "A consumer contract entered into on or after the effective date of this amendatory and supplementary act shall be written in a simple, clear, understandable and easily readable way. In determining whether a consumer contract has been written in a simple, clear, understandable and easily readable way as a whole, a court, the Attorney General or the Commissioner of Insurance, in regard to contracts of insurance provided for in subsection c. of section 1 of this act (C. 56:12-1c.), shall take into consideration the guidelines set forth in section 10 of this act.1 Use of technical terms or words of art shall not in and of itself be a violation of this act." N.J. Stat. Ann. § 56:12-2.

have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement . . . [and to determine] the existence or validity of a contract of which an arbitration clause forms a part." (Moving Br., at 18; AAA Consumer Rule R-14(a) and (b).) Defendant argues that this specific provision mandates that the issue of contract conscionability must be evaluated by the arbitrator. (Reply, at 15.)

In *Carrone v. UnitedHealth Grp. Inc.*, I held that "threshold questions of arbitrability are delegated to the arbitrator" when the parties clearly and unmistakably agree to such delegation. No. 20-5138, 2020 WL 4530032, at *3 (D.N.J. Aug. 6, 2020). In that case, Plaintiff sought to invalidate an arbitration agreement, arguing that it was unconscionable because, under the terms of the agreement, Defendant was permitted to unilaterally alter the agreement. *Id*. at 2. I held that, because Plaintiff's arguments did not specifically attack the enforceability of the delegation clause or the incorporated arbitration rules, the gateway question of arbitrability was still within the authority of the arbitrator. *Id*. at 3. This holding is in line with the decisions of numerous courts in the Third Circuit and New Jersey. *See e.g.*, *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010) ("Accordingly, [Plaintiff] challenged the delegation provision specifically, we must treat it as valid . . . and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."); *S. Jersey Sanitation Co. v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138, 143 (3d Cir. 2016); *McDonald v. CashCall, Inc.*, No. 16-2781, 2017 WL 1536427, at *4 (D.N.J. Apr. 28, 2017) ("If the plaintiff fails to challenge the delegation provision itself, 'the federal courts must treat the delegation provision' as valid, and 'leav[e] any challenge to the validity of the Agreement as a whole for the arbitrator." (quoting *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146–47 (11th Cir. 2015))); *Morgan v. Sanford Brown Institute*, 225 N.J. 289, 311 (2016) ("The party opposing enforcement of the arbitration must lodge

10

a specific challenge to the delegation clause. The failure to do so will require that the issue of arbitrability be determined by the arbitrator."); *see also Pocalyko v. Baker Tilly Virchow Crouse, LLP*, No. 16-3637, 2016 WL 6962875, at *4-5 (E.D. Pa. Nov. 29, 2016) ("[D]elegation of authority will be enforced, as long as the validity of the delegation itself is not being challenged.").

Here, similar to *Carrone*, Plaintiff seeks to invalidate the entire Agreement on the grounds that it is unconscionable. (Opp., at 9.) But Plaintiff does not specifically or explicitly challenge the delegation of authority to the arbitrator. Plaintiff cannot avoid arbitration without challenging the conscionability of the delegation provision itself. Under the straightforward terms of the Agreement, Plaintiff clearly and unmistakably agreed to arbitrate gateway issues: the Agreement expressly incorporates the rules of the AAA, one of which delegates the gateway issue of arbitrability to the arbitrator. (*See* Holbrook Decl., Ex H § 15(d).) In New Jersey, "incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." *Beacon Sales Acquisition, Inc. v. Bd. Of Trs. of the Teamsters Indus. Empls. Pension Fund.*, 425 F. Supp. 3d 377, 390 (D.N.J. 2019) (quoting *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003)).

Here, the Agreement specifically identifies the arbitration rules the terms aim to incorporate and, thus, the incorporation by reference to the rules is valid. Specifically, the Agreement states, "[t]he AAA will conduct any arbitration under its Commercial Arbitration Rules . . . For more information, see www.adr.org." (Holbrook Decl., Ex. H.) As I discussed in *Carrone*, by incorporating the AAA rules, which need not be appended to the arbitration clause, the parties have clearly and unmistakably committed to delegating the question of arbitrability to the arbitrator. 2020 WL 4530032, at *3; *see also Richardson v. Coverall N. Am., Inc.*, 811 F. App'x

11

100, 103-04 (3d Cir. 2020); *McGee v. Armstrong*, 941 F.3d 859, 866 (6th Cir. 2019); *Arnold v. HomeAway, Inc.*, 890 F.3d 546, 553 (5th Cir. 2018); *HealthPlanCRM, LLC v. AvMed, Inc.*, No. 19-157, 2020 WL 2028261, at *1 (W.D. Pa. April 28, 2020); *Ins. Newsnet.com, Inc. v. Pardine*, No. 11-00286, 2011 WL 3423081, at *3 (M.D. Pa. Aug. 4, 2011); *In re Paragon Offshore PLC*, 588 B.R. 735, 752 (Bankr. D. Del. 2018). Not only is the delegation language of the AAA rules unambiguous, but the Agreement itself adds clarity by highlighting the relevant delegation item: "Under AAA Rules, the arbitrator rules on his or her own jurisdiction, including the arbitrability of any claim." (Holbrook Decl., Ex. H § 15(d).) Therefore, I find that the threshold questions of arbitrability in this case are delegated to the arbitrator. Plaintiff may raise his objections as to the conscionability of the Agreement in arbitration.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is **GRANTED** and this case is **STAYED**.  This action will be **ADMINISTRATIVELY TERMINATED** pending the outcome of the arbitration proceedings.

DATED: August 9, 2021                                                          /s/ Freda L. Wolfson
                                                                               Freda L. Wolfson
                                                                               U.S. Chief District Judge